# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-CA-02001-SCT

*LINDA RICHARDSON,*

*INDIVIDUALLY AND ON BEHALF*

*OF THE WRONGFUL DEATH HEIRS*

*OF VIVIAN WHEELESS, DECEASED*

*v.*

*METHODIST HOSPITAL OF*

*HATTIESBURG, INC., NOW KNOWN AS*

*WESLEY HEALTH CENTER*

### ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 11/04/1999 |
| TRIAL JUDGE: | HON. R. I. PRICHARD, III |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | J. ANDREW PHELPS |
| | MARK THOMAS FINCH |
| ATTORNEYS FOR APPELLEE: | J. ROBERT RAMSAY |
| | GEORGE F. GATES |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED IN PART AND REVERSED AND REMANDED IN PART- 02/28/2002 |
| MOTION FOR REHEARING FILED: | 05/03/2001 |
| MANDATE ISSUED: | 3/7/2002 |

**EN BANC.**

**WALLER, JUSTICE, FOR THE COURT:**

¶1. The motion for rehearing filed by Wesley Health Center is denied. The original opinions are withdrawn, and these opinions are substituted therefor.

¶2. Linda Richardson, the daughter of Vivian Wheeless, filed a personal injury and wrongful death action

against Methodist Hospital of Hattiesburg, Inc., now known as Wesley Health Center, alleging that Wheeless died as a result of Wesley Health Center's negligent failure to provide adequate care. Summary judgment was granted to Wesley Health Center, from which Richardson seeks our review. Finding there is a genuine issue of material fact concerning whether negligent nursing care caused or contributed to the decedent's pain and suffering during her hospitalization, we reverse the summary judgment in part and remand for a jury trial on that claim. However, we affirm the summary judgment in favor of Wesley Health Center on the wrongful death claim because Richardson failed to present proof sufficient to causally connect the death of Wheeless to deficient care.

## FACTS

¶3. After complaining of nausea and vomiting blood, Wheeless was admitted to Wesley Health Center where she was originally diagnosed with upper gastrointestinal hemorrhage. Wheeless had a history of poor health, which included a stroke, delirium tremens secondary to alcohol abuse, elevated heart rate, fast breathing, and high blood pressure. During her stay at Wesley, Wheeless suffered a second stroke and subsequently died. The cause of Wheeless's death was recorded on the death certificate as cerebral vascular accident (stroke) secondary to artherosclerotic vascular disease as a consequence of hypertension. Wheeless's physicians concluded the stroke was caused by a totally blocked left carotid artery. Wheeless was a patient at Wesley from December 5, 1996, until her death on January 8, 1997.

¶4. Richardson alleges that Wesley caused or contributed to her mother's pain, suffering, and death by providing negligent and sub-standard nursing care. Richardson's expert was Crystal D. Keller, a Registered Nurse and Certified Legal Nurse Consultant, who was designated to testify to the appropriate nursing standards of care and deviations therefrom committed by the hospital staff. In her report, Keller set out in detail areas of failure attributable to the nursing staff at Wesley, which included: failure to monitor adequately; failure to inform physicians of significant changes in the patient's status; failure to follow physician's orders; failure to safeguard adequately; failure to provide adequate care; failure to document properly, accurately, and consistently; failure to assess and reassess adequately; failure to implement an appropriate plan of care; failure to evaluate the patient appropriately; failure to use critical thinking in the nursing process; and failure to assess adequately the patient's risk for injury. Keller's proffered testimony cites there were noted instances during Wheeless's hospitalization where she exhibited signs of gastrointestinal bleeding (black tarry stools), decreased laboratory values, changes in mental status and confusion, decreased blood pressure, increased heart and respiratory rates, restlessness, and agitation, all of which either were not reported to the physician or documented appropriately. Keller opined that the deviations from the requisite standard of nursing care led to Wheeless's suffering and subsequent death.

## STANDARD OF REVIEW

¶5. This Court conducts a de novo review of summary judgment motions and, therefore, considers facts without any deference to the trial court and applies its own interpretation of the law. ***Daniels v. GNB, Inc.***, 629 So. 2d 595, 599 (Miss. 1993).

¶6. Rule 56(c) of the Mississippi Rules of Civil Procedure allows summary judgment where there is no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law. M.R.C.P. 56(c). The standard of review for granting or denying summary judgment is that summary judgment must be denied unless the moving party has shown it is entitled to judgment as a matter of law after the trial court has reviewed all evidentiary matters in the light most favorable to the non-moving party.

This was set out by this Court in *Aetna Cas. & Sur. Co. v. Berry*, 669 So. 2d 56, 70 (Miss. 1996), as follows:

> The standard for reviewing the granting or the denying of summary judgment is the same standard as employed by the trial court under Rule 56(c). This Court conducts de novo review of orders granting or denying summary judgment and looks at all the evidentiary matters before it -- admissions in pleadings, answers to interrogatories, depositions, affidavits, etc. The evidence must be viewed in the light most favorable to the party against whom the motion has been made. If, in this view, the moving party is entitled to judgment as a matter of law, summary judgment should forthwith be entered in his favor. Otherwise, the motion should be denied.

## DISCUSSION

### A. Testimony as to Pain and Suffering

¶7. Richardson argues that summary judgment should not have been granted because there was a genuine issue of fact concerning Wheeless's pain, suffering, and death, established through the expert testimony of Keller. In support, Richardson offers Keller's education and sixteen years experience as a registered nurse and six years work as a legal consultant. Richardson believes that Keller's expert opinion is admissible as it is "helpful to the trier of fact," which is the relevant inquiry to be made pursuant to Mississippi Rule of Evidence 702.

¶8. We set the standard for expert witnesses in medical malpractice cases in *Hall v. Hilbun*, 466 So. 2d 856 ( Miss. 1983), where we said expert opinion testimony should be allowed where the witness is qualified and independent, and the testimony will assist the trier of fact. We find the trial court's ruling was overly restrictive in not allowing Keller to testify concerning the appropriate standard of nursing care and the deviations from that standard. There is sufficient proffered evidence from Keller for a jury to consider whether the inadequate nursing care resulted in worsening Wheeless's physical pain and suffering.

¶9. Wheeless's treating physician provided further support to the deficiencies outlined by Keller. Steven Farrell, M. D., treated Wheeless while she was hospitalized at Wesley and was deposed concerning his treatment and observations of Wheeless. Dr. Farrell expressed concern over the standard of nursing care that Wheeless received, stating that he believed the nurses were deficient in failing to timely notify him and the other treating physician concerning melenic (bloody) stools that were observed after Wheeless's admittance to the hospital. Even though Dr. Farrell did not opine that the gastrointestinal bleeding was in any way associated with the stroke that ultimately caused Wheeless's death, he did testify that the unreported bleeding could have negatively affected her condition. Dr. Farrell explained that the melenic stools would indicate either continued or repeat gastrointestinal bleeding and that there were also notations in the treatment records of low hemoglobin counts which could be indicative of significant hemorrhaging. Dr. Farrell stated "the loss of blood contributed to angina that she had, the chest pain that she had, and reflected poor blood flow to her heart." He went on to say that the continued bleeding could have led to heart problems and may have led to Wheeless's confusion because of poor blood flow to the brain.

¶10. In *Drummond v. Buckley,* 627 So. 2d 264 (Miss. 1993), the plaintiff filed a medical malpractice action after suffering pain and swelling in his lower back following surgery for a herniated disc. In *Drummond,* the plaintiff did not have an expert witness to show proximate causation; however, we ruled summary judgment was precluded. The facts of *Drummond* reflect there was a dispute over a

conversation between the physician and patient over the doctor's recommendation that the patient enter the hospital for treatment of his back infection. We noted that *Clayton v. Thompson*, 475 So. 2d 439, 445 (Miss. 1985), stated "proximate cause arises when omission of a duty contributes to cause an injury." *Drummond*, 627 So. 2d at 270. Here there is substantial evidence documenting deficient nursing care that may have contributed to Wheeless's suffering.

¶11. The fact that Keller is not a physician does not bar her right to testify concerning the standard of care for the nursing staff, but more appropriately may affect the weight of her testimony, which is an issue for the trier of fact. Considering all of the evidence in the light most favorable to Richardson, we find there is a genuine issue of fact concerning whether Wheeless suffered more physically and incurred more expense from the failures of the nursing staff documented by Wheeless's expert and that the circuit court improperly granted summary judgment as to pain and suffering.

¶12. Wesley argues that the claim for the pain and suffering as an element of the wrongful death action should likewise be denied pursuant to *Wilks v. American Tobacco Co.*, 680 So. 2d 839 (Miss. 1996). In *Wilks*, the jury found that cigarette smoking did not proximately cause the decedent's death. The heirs contended on appeal they were at least entitled to the decedent's lifetime damages that the heirs believed were overwhelmingly proven to be caused by cigarette smoking. The heirs' cause of action was exclusively under Mississippi's wrongful death statute. We held the personal injury action could not be maintained where it was not alternatively claimed under Mississippi's survival statute. *Id.* at 843.

¶13. The facts in Richardson's case reflect that the nurses' negligent actions exacerbated Wheeless's condition and caused pain and suffering, even if that negligence was not determined to be the ultimate cause of death. Though the survival statute is not specifically cited in the complaint, the pleadings in this case delineate two specific causes of action and are sufficient under our system of notice pleadings. We hold that Richardson demonstrated a genuine issue of material fact requiring a trial on her separate cause of action for Wheeless's pain and suffering. Therefore, the circuit court erred in granting summary judgment as to that claim.

### B. Testimony as to the Cause of Death

¶14. While Keller is qualified to testify concerning deviations in nursing care and resultant pain and suffering, she is not qualified to testify concerning the causal nexus between these deviations and Wheeless's death.

¶15. Richardson has cited other cases involving personal injuries where medical testimony was not required for proof of causation, including our decision in *Sonford Prods. Corp. v. Freels*, 495 So. 2d 468 (Miss. 1986), *overruled on other grounds, Bickham v. Department of Mental Health*, 592 So. 2d 96, 98 (Miss. 1991). In *Sonford,* we held that a toxicologist should have been able to render expert testimony that prolonged exposure to toxic chemicals caused injury and death to a workers' compensation claimant. We further held that there need not be expert testimony from a medical doctor to establish causation. 495 So. 2d at 474.

¶16. While we do not require expert testimony by a medical doctor in order to establish the cause of death, the plaintiff must show that there is causation in fact. *Trapp v. Cayson,* 471 So. 2d 375, 383 (Miss. 1985). It is not enough to show that there were deviations from the requisite standard of care for nursing. Here, Richardson has failed to make a required showing that the nurses' negligent failure to abide by the standard of care in fact caused or contributed to Wheeless's death.

¶17. The cause of a stroke or, in Wheeless's case, a second stroke, is a complex medical issue. Wheeless's doctors discussed the cause of death in detail, and none were supportive of Richardson's theory of wrongful death.

¶18. The trial court ruled that Richardson's designated expert witness, Keller, was not "qualified by education or experience to render relevant testimony with regard to the mechanism of Ms. Wheeless's death and/or causal connection between these alleged deviations and Ms. Wheeless's multiple severe medical problems," and therefore "would not be allowed to render medical opinions as to the multiple medical diseases and/or conditions suffered by the Plaintiff during this lengthy hospitalization at Wesley or the cause of these conditions and/or the cause of her death."

¶19. We agree with the circuit court that Keller lacks the requisite education and experience as an expert to testify concerning the causal link between Wheeless's death and the alleged deviations in nursing care and further that her proffered testimony does not specify such a link. Therefore, the circuit court did not err in granting summary judgment for Wesley on the charge of causing her wrongful death.

## CONCLUSION

¶20. The trial court erred in granting summary judgment to Wesley on Richardson's claim for Wheeless's pain and suffering. We therefore reverse the judgment below in part and remand to the Circuit Court of Lamar County for a jury trial on the claim for Wheeless's pain and suffering. In all other respects, we affirm the judgment below.

¶21. **AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.**

**PITTMAN, C.J., SMITH, P.J., COBB AND CARLSON, JJ., CONCUR. McRAE, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, EASLEY AND GRAVES, JJ.**

**McRAE, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶22. The majority is "splitting hairs" in reversing the summary judgment for Wesley on the claim for Wheeless's pain and suffering and any extra damages that may have occurred for the pain and suffering but upholding the judgment on the wrongful death claim. I agree that this case should be sent back for trial, but I would send it back for trial, not only for pain and suffering, but also for the wrongful death as there is ample evidence and opinions to support the denial of summary judgment and for trial and to allow a trial to occur and let the trier of fact determine the credibility of the expert. The majority has concluded that Keller was qualified to testify concerning deviations in nursing care and resulting pain and suffering, but it refuses to allow her to testify as to causal nexus between deviation and Wheeless's death. This is a "splitting of hairs" when one is allowed to testify and she has expert qualification, enough to testify as to pain and suffering, but not go the one step forward, that leads to death. More importantly, there are additional matters that are sufficient enough to allow this case to go to trial that will be later discussed.

¶23. The record before us reveals evidence that Vivian Wheeless was allowed to continue bleeding internally due to negligent nursing care. This bleeding caused the low blood count that is associated with high output congestive heart failure, of which she suffered, and further restricted the already severely limited

blood flow to her brain. Because there exists evidence sufficient to support a finding that the negligent nursing care contributed to her suffering and probably her death, I would reverse the grant of summary judgment and remand this case for a jury to determine the credibility of the expert and the cause of the stroke. Accordingly, I concur in part and dissent in part.

¶24. Nurses are trained to be the eyes of the doctor and to monitor the patient's condition or changes for the doctor while he or she is not there. Nurses are trained to recognize symptoms and injuries. They are also trained as to the reason why they have to specifically recognize these symptoms, illnesses, and injuries. Their training also consists of what happens when the symptoms are not recognized. Thus, they should be allowed to state an opinion of causation, and the jury can decide the weight of their testimony. The witness, Crystal Keller, has been a registered nurse since 1986 in Louisiana, and since 1987 in Virginia. Her application for registered nurse status in Mississippi was pending at the time this appeal was taken. She was employed as a nurse by various hospitals from 1986 through 1997. From 1993 to present, Keller served as director of Medical-Legal Consulting Services, an organization she founded to provide expert nursing opinions in expectation of litigation. These qualifications are hardly "meager," as the hospital contends.

¶25. In her report, Keller stated that "[t]he nurses failed to recognize signs and symptoms associated with a GI bleed and decreased laboratory values which affect the cardiovascular system and alter the mental status." She concluded that the failure of the nurses to notify the doctors of these symptoms, along with other deviations from the nursing standard of care, ultimately led to Wheeless's death.

¶26. In *Hooten v. State*, 492 So.2d 948 (Miss. 1986), we held that the trial court abused its discretion in failing to qualify a handwriting witness as an expert. The witness's formal education consisted entirely of correspondence courses taken through the International Graph-Analysis Society Institute of Chicago, where she completed an eighteen-month course of twenty lessons in less than a year. After voir dire, the judge determined that she lacked the educational background to qualify as an expert. *Id.*

¶27. We reversed, holding that her fifteen years of experience and testimony in 300 trials "places her clearly within the ambit of our rules regarding experts." *Id.* "We emphasize that in situations such as this, attacks on the expert's qualifications and methods are better directed toward the weight of the testimony than its admissibility."*Id.* (citing *Henry v. State*, 484 So.2d 1012 (Miss. 1986) (emphasis added)).

¶28. Nurses are not laypersons. They are trained to recognize symptoms and injuries that are life-threatening. They are trained to monitor patients and notify doctors of any adverse changes in their condition. The college that Keller attended and the conclusions that she reached in her report should be challenged on cross-examination, and the weight to be given her testimony should be determined by a jury, rather than dismissed on summary judgment.

¶29. Based on our holding in *Hooten*, Keller should be allowed to testify in light of her training and more than 16 years of experience as a registered nurse including six years of experience as a legal consultant. Because of her experience and work background, she is able to testify as to what led up to the death, not just pain and suffering.

¶30. The majority cites *Trapp v. Cayson*, 471 So.2d 375, 383 (Miss. 1985), for the well-established rule that "the plaintiff must show that there is causation in fact." In *Trapp*, we held that a "jury must believe by a preponderance of evidence Dr. Trapp violated that duty and negligently did, or failed to do, certain acts, which proximately caused or contributed to Cayson's injuries." *Id.* We went on to cite another well-

established rule in that case, that the credibility of medical experts is for a jury to determine. *Id.* at 380.

¶31. While the majority recognized Dr. Stephen Farrell, who treated Wheeless and noted some of his opinions, it failed to recognize that Dr. Farrell's testimony further bolstered the testimony of Keller as to causation. While there is no question that he was a reluctant witness, his testimony alone is enough to send the case to a jury without Keller's testimony, but with the combination of both, it is sufficient enough for the testimony to go forward on all issues.

¶32. Dr. Farrell treated Wheeless at the hospital. He testified in his deposition that after she was admitted in the Intensive Care Unit, family members told him that they were concerned because she experienced some "melenic" (black, tarry) stool that was not reported to the doctors. He testified that he would expect the nursing staff to report this condition to doctors "[b]ecause if we believe a person to be stable from having had gastrointestinal bleeding . . . if they have recurrent melenic stool, then it could indicate a recurring bleed." He further stated, "that should be reported emergently to the physician because she could be bleeding again significantly when she was presumed to be stable."

¶33. Dr. Farrell testified that internal bleeding could have exacerbated Wheeless's congestive heart failure. "The presumption was by Dr. Wilkins, the cardiologist, that she could have a form of congestive heart failure called high output failure which was associated with a low blood count." He further stated that a low blood count could be caused by excessive bleeding and that a recurring bleed could cause her hemoglobin hematocrits to become unstable. This means the volume percentage of oxygen-carrying hemoglobin in her blood would fall. In other words, her heart was already impaired in its ability to maintain adequate blood flow, and internal bleeding would further impede the amount of oxygen that her heart was able to deliver to her brain.

¶34. The death certificate stated that Wheeless's death was caused by a "cerebral vascular accident," or apoplectic stroke, due to atherosclerosis caused by high blood pressure. Her treating physicians determined that Wheeless suffered from a completely blocked left carotid artery. As a result, the entire left hemisphere of her brain was being provided with blood only through the development of new vasculature from the right hemisphere. She also suffered a stroke on December 11, while in the hospital.

¶35. In spite of her delicate condition, at no time was Dr. Farrell notified by the nursing staff that Wheeless was exhibiting symptoms of internal bleeding. He testified that "I believe the loss of blood contributed to [the] angina that she had, the chest pain that she had, and reflected poor blood flow to her heart . . . It could have led to some of her confusion that she was having and poor blood flow to her brain."

¶36. Wheeless suffered from numerous conditions which caused her to have severely restricted blood flow to her brain. The nursing staff was aware of this. Whether her internal bleeding, which further limited what was already considered "poor blood flow to her brain" and created fluctuations in her blood pressure, caused her fatal stroke is a question for a jury to determine. The qualifications of the causation experts "are better directed toward the weight of the testimony than its admissibility." *Hooten*, 492 So.2d at 949.

¶37. In her report, Keller cited numerous "deviations from the Nursing Standards of Care which lead to the injury and subsequent death of Ms. Vivian Wheeless." She concluded that there were deviations throughout Wheeless's stay in the hospital, but that the deviations of the nurses on floor 2E are what led to her injury and subsequent death on January 8. On December 20, Dr. Farrell had Wheeless transferred to a different room and ordered that she not be returned to the nursing staff on floor 2E.

¶38. The testimony of Dr. Farrell, along with the proffered testimony of Crystal Keller, are sufficient to create a jury question as to the causation between the treatment of Vivian Wheeless and her injuries. Due to Keller's education, training, experience as a nurse, and experience in litigation consultation, she should not have been disqualified as an expert, and her credibility should be weighed by the jury. The burden is on the movant to prove there are no triable issues. There is sufficient evidence for this case to be tried by a jury. As the majority notes, the cause of a stroke is a complex medical issue, and it should not be determined by this Court. I would reverse the grant of summary judgment and remand this case for a jury trial on all issues including causation on death and not just pain and suffering prior to death. Accordingly, I concur in part and dissent in part.

**DIAZ, EASLEY AND GRAVES, JJ., JOIN THIS OPINION.**